Oral argument not to exceed 15 minutes per side, Christopher Oldham May it please the Court, Your Honors. Christopher Oldham of the Knoxville, Tennessee Bar for the Appellant Merrell Neal. I would request that the Court reserve five minutes for rebuttal. Subject to questioning by the Court, I'd like to focus my argument on two issues that I've raised in my appeal, Mr. Neal's appeal. The first is the issue of standing, which I think is a very short and simple issue. And then the second one is the issue of probable cause of the search warrant that was issued on the search of Merrell Neal's house, which led to the arrest of Mr. Neal and his brother and other gentlemen. First on the issue of standing, the Magistrate Court, upon looking at the search warrant, there was a hearing on the search warrant. It started out as a suppression hearing that was coupled with what might have turned into a Franks hearing, which the Court determined was not necessary at the time. During the suppression hearing, the issue of standing was not raised at all by either the movement, Mr. Neal, or the government, nor was it addressed by the Court at the time. When the opinion was issued some eight months later, the Court determined that Mr. Neal did not have standing to challenge the search warrant and relied on the Pollard case saying that the visits by Mr. Neal were purely of commercial purpose. This really ignores long-standing law, and I think the Olson case is controlling here. What it ignores is that Mr. Neal is brothers with the owner of the house. There was no evidence before the Court that Michael Neal, the younger brother of Merrell Neal, did not live there. He did maintain another residence, but there is no evidence that this was not his primary residence or that he did not live there on a substantial basis. The other evidence that was before the Court was that Mr. Neal, Merrell Neal, was an overnight visitor on the two occasions that were before the Court. Mr. Neal was an overnight visitor for at least one night on the first occasion and two nights on the second occasion. Quite frankly, there is more than commercial activity going on here. Not only is he a family member, there are overnight visits involved here. Mind you, there was no evidence taken at the Court. There was no testimony taken at the Court beyond what was written in the search warrant. To understand the summary of the evidence, you're saying the evidence was that the defendant here, Merrell Neal, stayed overnight two nights in the house. Three nights. Two nights one time and one night another time. Correct, Your Honor. Was there evidence that the house was furnished as a house? The only thing that was brought into evidence is there's a statement by the confidential informant, Ms. Dixon, that the house appeared to have little furniture or food. That's the only thing that regards that. Now, I somewhat jokingly raised this in my objection to the report and recommendation. What constitutes little furniture and little food? If you went into any college student's apartment, you might not think anybody lived there. But quite frankly, it's just based upon an opinion of what constitutes little furniture and little food. We saw the photographs afterwards that they took and there was furniture. There were sofas. There were tables. There was food all over the place. I will say the one thing that I know this Court has told me time and time again never to say. I did not conduct the suppression hearing. I was appointed after the suppression hearing to take over this case. So I'm not exactly sure what the Court saw at the time. I apologize for saying that because I've been told by this Court never to say that. But I think it's important to note that the only thing that the Court references, the magistrate references in the report and recommendation, is that there are two statements. That there appeared to be little furniture and little food in the house. And secondly, that it appeared to be for commercial purposes. Although I know that there was evidence that was looked at by the Court that talked about his overnight stays and the fact that he was his brother there. Now the trial court did not address the issue. It said we don't need to get to the standing issue because the search warrant itself is sufficient. So it just blew past the issue of whether or not they were standing. I think it's important for this Court to address it because you can't get to the search warrant without addressing whether he had standing or not. So I think that Pollard is inapplicable here. Pollard clearly was a visit for commercial purposes. There's no question about that. In for a couple of hours, out. And for commercial purposes I would agree. Probably standing doesn't exist. But this is a family member who the evidence in the record, we know that he stayed at least three nights there. There's no other record about other visits. The Court could have required testimony or sought testimony about other visits. But the Court limited its review to the four corners of the warrant for the most part and some other issues. Is it important for standing purposes that the defendant on this visit was there for longer than making a commercial deal? The Supreme Court seems to think so. Also, overnight guests are treated with more deference than people that come in just visiting. So with respect to this visit, this defendant was just there for a deal? Is that correct or not? There's nothing in the record to indicate anything one way or the other. The record is bare on that point. If one presumes that it's not in this record, there is evidence that they traveled outside the house and did other things that's not contained in this record. That was not in the issue as considered by the magistrate. So there's nothing in this record one way or the other to indicate that there were personal activities going on or solely commercial. There's just nothing in the record one way or the other. So I think you have to go with the standard set forth in Olson that says an overnight guest is given more deference in terms of standing than someone that comes in purely for a very short term commercial visit. If you want to move on to your other issues. Sure. The second issue and the meat of this argument is the issue of probable cause on the search warrant. The main problem as I see it with the search warrant is the credibility or lack thereof of the confidential informant, Ms. Dixon. This is an issue where the Chicago FBI office obtained a source. A person came to them and said, hey I've been traveling to Knoxville, Tennessee and I've witnessed a cocaine deal in Knoxville, Tennessee. This person was completely unknown to the Chicago FBI. They had no idea who this person was. She gave some bare bones information, all of which turned out to be inaccurate quite frankly. The important thing is she was not able to provide accurate information. She was an unknown and untested informant and she gave inaccurate information. She was incorrect about the dates of the trips she had just taken. Within the past two weeks she was unable to recall just the dates that she had taken these trips. She gave an address of the house. Admittedly she said that the address that she gave was not the address of the house, but she gave an address of the house. She described the house in Knoxville, Tennessee. What address did she give? She didn't know what the address was, but the address that was punched into the GPS was 800 Beeman Street. That's not inaccurate. That's accurate information as to what this person did. It's not inaccurate is it? We got to the house by using 800 Beeman Street. That's pretty accurate. It says the house is near 800 Beeman Street. If you punched in 800 Beeman Street you wouldn't get anywhere near the house. It's accurate to say that she did describe that he punched that in there, but she wasn't able to provide an accurate address for the house. Like 837 instead of 537? 637 South Beeman Street. There is no Beeman Street in Knoxville, Tennessee. There's a North Beeman Street and a South Beeman Street. That's the basis for saying she's inaccurate? She said Beeman instead of South Beeman? That's just a start. There are other things in it. She describes the house alternately as being either a one story greenhouse or a two story greenhouse. Then the police based on that were able to identify which house it probably was. Is that right? The police identified two houses it could potentially be and that was based on the investigation. Then found one of them was owned by the brother? By the brother, yes correct. This is police work. But when shown pictures... Doesn't that focus you that this might be the house? That's a start. There's no question about that. That's a start of police work. A start of police work based on non-false statements? Some statements are inaccurate as we get to. Inaccurate because you didn't say North behind Beeman Street? She didn't say 637 South Beeman Street. She also described the house... She didn't say an address that had 37 in it though, right? That had green on it? She described it as being a one story... There's two emails from the Chicago field office. One that describes it as being a one story greenhouse. The other describing it as being a two story greenhouse. It was a one story white house. They say that there's trim on the green, but she says she never went in through the front door. She says she always entered through the carport. That's just trying to save this, but there's never any indication that she actually accurately describes the house. I see your red light is on, so you can either continue with your remaining five minutes now, or you can save it for rebuttal. I guess if there's a question I'm trying to finish up, if not, if I've answered it to the court's satisfaction. In any case, I will reserve the balance of my time, Your Honor. Certainly. Good morning, Your Honors. I am Tracy Stone, an AUSA from the Eastern District of Tennessee, here representing the United States, and I am the AUSA to handle this case below. It is quite an honor to be with you this morning. I will, I suppose, follow Mr. Oldham's presentation, and I will start with standing. I will give it very brief attention, unless the court deems otherwise appropriate. The district court, as Mr. Oldham indicated, did not really decide the issue of standing, even though the magistrate judge did, and it's R&R, and the R&R, of course, is just that, a report and a recommendation. And the district judge decided it didn't need to reach that, and so the United States, at this moment in time, in the midst of this appeal, does not believe that that issue is really even before this court. And I will make an alternate. If we were to accept the merits argument of your opponent, we would need to find that he had standing to challenge the search warrant, wouldn't we? Suppose we thought this was a really defective search warrant. Okay. My analysis there is the district court presumed standing, and frankly, that inures, I think, to the defendant's favor. And then ruled against him. So it's okay to presume standing under those circumstances. But you wouldn't want us to presume standing and then rule in favor of him, would you? Well, no, because I think that wouldn't be the appropriate outcome. Are you conceding standing for purposes of this appeal? I think I generally, well, I won't go quite that far. To the extent this court is willing to rule on standing, I would make one very brief statement as to the law. Standing, of course, is the defendant's burden. And we hear about what was presented or what was before the magistrate court regarding standing. But if there were other facts that would have shown standing, it was the defendant's burden to show that. Well, the defendant says that his client was there for three overnight visits. Why isn't that enough to give him standing? I think this is based on the confidential informant's grand jury testimony that was introduced into the record at the magistrate court level. And what she, I believe, testified to is she'd been there twice before, once a one-night visit and once a two-night visit. So that's the three nights. And then reported what she said about no furniture, et cetera. We're only there to sell drugs. And once the drugs were gone and the money was in hand, back to Chicago. Did she say that they stayed overnight? Yes, because it took that long to get to sell as much drugs as they had brought down. But they weren't sleeping. Why can't a brother visit a brother and stay overnight and sell drugs? That's their recreational activity. And why does that preclude standing? And I understand he has the burden to show standing, but normally an overnight visitor would have an expectation of privacy and would have standing, arguably, and why not here? I suppose that the answer to that would have to be a reflection of one's interpretation of societal norms viewed within the prism of case law. And the case law that the magistrate judge relied upon concluded that such a visitor under those circumstances would be there for the commercial purposes of selling drugs, not the otherwise societal norms of watching movies, going to a restaurant, playing Monopoly. I don't know. But the fact of the matter remains that the record is what it is, and I believe the record would not support standing in Mr. Merrill Neal's case. That's not your primary argument. It's not my primary argument. Would you cede your primary argument? I would. If I could append to that in terms of there was a little bit of inaccuracy about what the proof really would show at this point. There is in the record the search warrant return. And the search warrant return, which, by the way, to answer your question, Judge Moore, about the nature of Merrill Neal's visit on this date, there is in the record in the search warrant documents in return and the times that are shown there that the search warrant was executed ten minutes after the magistrate judge signed it. So in fairness, there was no opportunity to discern what type of visit this visit was, except for the fact that there were no clothing, no toiletries, nothing of that nature was recovered during the search. And that duffel bag was drugs, and that was it. So to the response to the primary argument on probable cause, Your Honor, what I would like to do is this. The defendant's brief focuses primarily on two cases, Higgins and Dyer. And, of course, Dyer being the dissent language of Judge Moore. And so what I would like to do is if I could point, Your Honors, to page 13 of my brief. And about halfway down the first full paragraph, I sort of summarize the historical events reported by the confidential source in this case. And what I would suggest, just to sort of frame this, is if Your Honors would bear with me and presume for a moment that instead of a confidential source, and I realize I'm getting to an obvious point, but if we would presume for a moment that instead of a confidential source, what we had here was an undercover officer. Nobody would bat an eye. So it's not the information that the source provided. The information was solid. It was good. There's no question that it would have supported probable cause. The only question is, should this judge have believed what was written about this source and what she reported? And if we were to stop at the end of the historical summation of what the source reported, and the FBI, for example, the day after the second trip, the source reports what happened, and we go to the judge, and we get a warrant, and we execute it, I think we would be here in much more similar circumstances to Higgins and Dyer. What criminal activity did the source report? Report it. Historically, even the day before. Of course, Higgins, I think, was seven days before. But we would be very similar. But I would hasten to point out, Your Honors, that something... Oh, I'm sorry. I didn't... I'm curious about that also. I didn't... She reported as to the second trip of being present when Meryl Neal brought the bag from the trunk of a rental car inside, contained cocaine. He and his brother... Did you report that the bag contained cocaine? Yes. And that it was cooked into crack cocaine, that seven or eight customers came to the house, paid cash, bought sums of crack cocaine, and I think cocaine, too, and that a certain amount of money was earned or generated, and Meryl Neal took a certain quantity back to Chicago, and some drugs were still left over. So that's what the confidential source reported, but that was not verified by any of the police officers, right? And that's the point of my hypothetical about had this been an undercover... But it isn't. Right. Exactly. Exactly. So far as I understand it, the things that are verified by the police are innocent details, such as the location of the house, the nature of a car, whether the car is frequently at the house. All of those are innocent details that anybody with a grudge could become a confidential source and say, so-and-so is dealing drugs and they have a green car and they live in a white house and it's on Beacon Street or whatever. I understand. I'm so glad that you asked that question. Good. Good. So why is this anything beyond corroboration of innocent details? Yes. And here's where I'm going. First of all, the question, I think, suggests what I would call, respectfully, the superficial attraction to Higgins and the Descent and Dyer. Okay. And I get it. Okay. But that wasn't all that was corroborated, was it? Because what did the agent do in this case? Instead of just reporting to a judge what had been reported to him, he went out and over three weeks' time did everything he could do footwork-wise. He put video surveillance of the house, conducted physical surveillance of the house and Mr. Michael Neal, and concluded in his own opinion that this was a situation at the house that did appear to be drug trafficking-related. What specifically did the agent see and put in the warrant? High volume of traffic to the house. And my recollection of my reading of the record was that was the one item that arguably was crime-related, that there was a high volume of traffic that was not consistent with a normal house but was consistent with drug dealing. That was the one factual observation. Now, I would argue that although this wouldn't necessarily hold water in trial in a 404B context, but in this context with the probable cause standard and that a search warrant is an investigative tool, I would argue that the felony drug convictions of the Neals in this case, to include a federal cocaine felony conviction of Mr. Merrill Neal, I would argue that, again, we're totality of the circumstances, right? I mean, we're not line-by-line scrutiny. And so when you consider all of that together, along with the highly detailed nature of the otherwise arguably innocent facts of a color of a house, a car, all of these things granted, I mean, how is the source going to report not going to report those things, right? That's got to be part of the reporting, and that's where I would suggest to this court that this is where the sort of superficial attraction comes to Higgins and Dyer. So where I would go is, yes, you're onto that, and then I would also append some things that are a little bit more logical and analytical as opposed to firsthand observations by an agent. And these would be, you know, I hate to say it, but almost what feel like little throwaway sort of lines in a brief. Statement against penal interest. Identity known to law enforcement. All of these things that are real, and they do matter, but in terms of human beings, there are these things, there are these concepts that are sort of logic-driven, and they don't really draw out in a person, okay, why do I really believe what this CI is saying? And what I believe is the events of May 20 and 21 of 2011 make all the difference, irrespective of whether anyone believes... The trip down. The trip down. Whether anyone believes that Higgins, Dyer, however anyone wants to interpret those cases, the divergence comes on the trip down. And the trip down goes like this. The informant calls the agents in Chicago and says, hey, Merrill Neal has just called me, he's going to come pick me up. He's in his Impala, though, he's not in a rental car this time, he's in a Chevrolet Impala. Okay, so this is about 8.30 of a Friday evening, and the trip takes the entire night. And so that entire night, I would like the courts to consider, what did the agent do in this case? And this is what the agent did, and it's in the affidavit. The agent got permission to locate the source's phone and confirm that she was, in fact, en route from Chicago to Knoxville. The source sent a text out from where she thought she was, in Louisville, Kentucky, and got her location to the agents. I mean, this is the... All of that is corroboration of innocent information so far. I would disagree that it's innocent because, for this reason, we have to, I think, look at this with rationality, what I would call rationality, that you have an informant who's informing the FBI, hey, we're in the middle of another trip. They could be car stopped, a dog could alert on the car, and she's provided all this information to the FBI. I would suggest it just defies logic. But, in direct answer to your question, had this been an anticipatory search warrant? You know, maybe even then we would have a little more to talk about, notwithstanding a condition precedent of arrival or something, but just in terms of, you know, at the point of time the text comes in, I'm in Louisville, Kentucky, had it been an anticipatory search warrant, you know, maybe even then it's a little different. But that's not what happened. The agents saw the car in Tennessee. They figured out from the records it's registered to Merrill, Neal, and Illinois. They see the car arrive at the house, the very house that was in the warrant. And just like the informant said, Merrill, Neal, the driver went to the trunk, got a duffel bag, and went to the house, and five minutes later... That's in the affidavit too? All of that's in the affidavit. So this is somebody who's driving for the third time... Yes. Detroit to... Chicago. Chicago to Knoxville. Chicago to Knoxville, north-south. Driving south on... It's all confirmed, is that right? Everything exactly as reported by the CS. Well, conceivably, they could be just buying and selling cookies. Yes, and to that question, I would ask this. What if nothing had been found? Would we really look at this and say, this is not what we want law enforcement to be doing? I mean, isn't that the question? That is the question. That's the question. And this is an agent who didn't do what happened. And I'm not criticizing the officers in Higgins and Dyer. I wasn't in their shoes. But I know what happened in this case. And this agent took weeks of time and did everything he could possibly do, and at the moment that this thing apexed, within five minutes, the magistrate judge signed it, and ten minutes later, they execute the search warrant. And I suggest, Your Honor, and I know I'm biased, but I suggest, Your Honor, this is what we want. This is what we want. We want agents doing this sort of work and going to neutral judges. This is what we want. And I find no fault in it. I find no defect in it whatsoever. To me, it is an example to be held up to perhaps the officers in Higgins and Dyer and say, you see? This, it's different. And I take your point to be that it is possible that everything you see is innocent, but just increases the possibility that there's something illegal going on. The law allows that, doesn't it? The circumstances, and we are under gates, and I don't harp on that because I think that we really can become more comfortable if we almost assume that the law is otherwise, right? And really look at this and really drill down. It's good. It's well done. Thank you. Thank you. Your Honor, to take up back where I left off earlier, one of the things that, when I was talking about the facts in this case and what I consider to be some of the inaccurate facts and some of the inaccurate reporting, one of the important things to remember is is that the agent in this case, who did all this work, had never spoken with the confidential informant. All of his information was being laundered, and I use that term purposely. It was being laundered through the Chicago field office. They were snipping out things that were being sent to Agent O'Shea. Now, I've never seen the e-mails. I don't know the phone conversations, and I don't know the e-mails, but I do know the e-mails that were exchanged between the Chicago field agents, and the Chicago field agents had great doubt about this person's credibility. For example, talking about the house, and when I say the difference between the green house, the one-story, two-story green house, versus the white house with the green trim on it, Agent O'Shea was the one that verified that it had green trim on it. The Chicago agents put two pictures, two photographs in front of the confidential informant, and the confidential informant, the first time was unable to identify him, just completely unable to identify him according to their own internal e-mails. They brought her back a second time the next day, and she said, possibly, only possibly, could one of them be the house that she visited, only possibly. They had their doubts about her. Now, whether that was getting down to Agent O'Shea or not, we don't know. There were e-mails exchanged between the Chicago field agents. There was a conversation that was supposed to have occurred. There was an e-mail that was exchanged between the Chicago field agents saying, I think she's lying to us. There was, and they say later on, this was a joke. You know, six months after the fact, they said, oh, this was a joke. But there was an agent that went to visit the home of the confidential informant, comes back and writes an e-mail saying there was a note on the door saying, gone to Knoxville, see you later. They had great doubts about this confidential informant. In the trip where she was monitored, it arrived at the house that they identified. Is that right? No, the confidential informant never identified the house. Agent Nocera did. He did, right? He went and used what he found, used whatever information he got, plus the fact that it was owned by the brother of the person they thought they were talking about. So they identified a house, and then that's where the car came, right? Is that right or not? That's correct. Well, why are we quibbling about how accurate they were about the house? They found the right house, and it turned out to be the house that this car was coming to. And it's the house that they'd been looking at where there'd been all this activity, right? Respectfully, that's just not the standard that we use in the United States. But is it true, though? It's accurate. Truth? I meant. It's accurate. There's no question that they arrive at the house. You can arrive at a house where the confidential agent says, I've seen crimes committed, but we need to know whether this confidential agent is telling us accurate stuff. And it turns out that these middle-of-the-night trips to places where there's a lot of activity in the middle of the night is accurate. Is that true? You can say that's not the standard, but is that what the facts show? Can I address two things that you state there? Number one, it's important that the confidential agent never identified the house. It's one thing to say there's a house on 110 Mercedes Avenue. That wasn't my question. She said there's a house and gave some indication of what that house was, and maybe it was a little unbelievable or not. But they, based on that, pointed to a house, figured out a house. And then that's the one they watched. They found that it was a house. Stop me where it's not on the record. Identified it as a house where there's a lot of nighttime brief traffic. Stop you there. It doesn't say that there's a lot of nighttime briefing. It just says it identifies a lot of traffic. A lot of traffic, thank you. And then not saying, oh, somebody's coming, but it's actually in the car. And so it's accurately, presumably, confirmed that that's where they're coming, and they go to that house. I would note one thing. They didn't go to that house? They did go to that house, but I wouldn't note one. That confirms that any doubt we might have had that this is the right house, based on her identifying the wrong house, has now evaporated, hasn't it? We don't know that. Why did they go to that particular house? We don't know that they didn't go to a different house the first two times. We don't know that. This time it went to this house. It went to this house. It did not go to the house that she described, but how did they figure out what house to go to? They weren't relying on her information. The FBI? Agent Nocera went and pulled the KUB records, the electricity company records, and identified that address as registered to Michael Neal. That's how he got the house as being Michael Neal's house, through utility records. That's what he did. Wasn't there something? She said she thought the number was 537 or something. No, no. I don't think she ever addressed the numbers. I don't think, recalling back in the record, that she ever addressed the records. My time is up if there are any questions. Thank you both for your argument. One question that I've been struggling with is I'm trying to find the last couple pages of the search warrant affidavit, and I've checked on the computer, and the last numbered page that I have is page 10, and I think that it ends in the middle of number 17 in the search warrant affidavit. So if the two of you could file it. Oh, I see that Judge Rogers has found it. My clerk. So you don't need to worry about it. I will borrow it from him. So we thank you both, and I see, Mr. Oldham, that you're appointed pursuant to the Criminal Justice Act, and we thank you for your representation of your client. The case will be submitted, and would the clerk call the next case, please.